THE INTERNATIONAL FAIR & EXPOSITION ASSOCIATION
OF DETROIT v. HIRAM WALKER.

[See 83 Mich. 386.]

*Corporations—Action on subscription—Preliminary agreement—
Waiver.*

1. After the passage of Act No. 6, Laws of 1889, authorizing the
incorporation of associations for exposition and exhibition pur-
poses, the defendant became a subscriber to a preliminary
subscription paper, by which the signers agreed to subscribe
for and take stock to the amount set opposite their names in
a corporation which the agreement stated they believed should
be organized, with a capital stock of *at least* $250,000, for the
purpose of purchasing suitable grounds and erecting suitable
buildings thereon, upon a plan similar to the Buffalo Exposi-
tion. The subscriptions were not to be binding unless the sum
of $100,000 was subscribed within 60 days from the date of the
agreement, which condition had been complied with prior to
the passage of said act. The association was organized after
defendant had made his subscription, with a capital stock of
$500,000, of which only $254,500 was subscribed. The articles
of association were not signed by the defendant, nor did he
subscribe for any of the capital stock except as before stated;
but he attended a meeting called to select a site after such
incorporation, and voted stock to the amount of his subscrip-
tion. Grounds were purchased and buildings erected, and a
fair held in the fall of 1889, and a dividend of five per cent.
upon the subscribed capital was declared. Assessments were
duly made upon the subscribers to the subscription paper and
to the articles of association for the full amount of their sub-
scriptions, which assessments were based upon the amount
actually subscribed, and not upon the entire capital of $500,000.
The defendant was notified of the assessments, which he
refused to pay, and after tendering him a certificate of stock
for the amount of his subscription, and demanding its pay-
ment, which was refused, as also the acceptance of the certifi-
cate, a suit was brought, in which the plaintiff declared
specially upon the agreement of the defendant to subscribe
for and take $5,000 stock in the corporation, and averred its
acceptance of said subscription, and that in reliance thereon it

purchased the land and erected the buildings in accordance with the purpose of the corporation, and as a breach averred the neglect and refusal of the defendant to subscribe and take stock in the corporation, and pay any sum or sums thereon, according to the form and effect of his said agreement, to which declaration the common counts in *assumpsit* were added. On the first trial the defendant introduced no testimony, and a verdict was directed in his favor, and the decision of this Court reversing the judgment entered thereon is reported in 83 Mich. 386. A second trial has been had, and, in reversing the judgment entered upon a verdict directed in favor of the plaintiff, the majority of the Court (LONG and MORSE, JJ., dissenting, and adhering to the former opinion) hold:

*a*—That Act No. 6, Laws of 1889, does not authorize associations organized under it to proceed to the transaction of business until the entire capital stock is subscribed; neither does it authorize or provide for any preliminary subscription for stock, nor for any subsequent subscription to the capital stock.

*b*—That as a general rule, where the capital stock and the number of shares are fixed in the recorded certificate, no valid assessments or calls can be made on the subscriptions until the whole capital stock is taken, unless there be a provision to that effect in the certificate or in the general law under which the corporation is organized, and in such case the subscriptions may be considered to that extent conditional.

*c*—That the contention of the plaintiff, that it was the intent of the subscribers to the preliminary subscription paper that a corporation with a capital stock of $250,000 would contain sufficient capital for the purpose for which the corporation was to be formed, which sum was subscribed at the time of its organization, and that the subscribers were willing to be bound to pay their subscriptions if $100,000 was subscribed within the 60 days, although the whole capital stock was not subscribed, is untenable; that their agreement must be read in the light of what the act required should be done to legally organize the corporation; and that there is nothing upon the face of the agreement which would render the defendant liable to pay for his subscription unless the whole authorized capital was subscribed.

*d*—That, while the defendant was estopped by his conduct from denying that he was a stockholder and member of the corporation, he was not liable to be assessed upon his stock unless he had waived the condition that the whole capital stock must be subscribed before such assessment could be

legally made; that the burden of proof was upon the plaintiff to establish such waiver, which would depend upon the knowledge which defendant had that the stock had not all been subscribed, and upon his acts and conduct tending to show that he was willing and desirous that the main purposes of the corporation should be proceeded with without such stock being subscribed, which facts were not conclusively established on the trial; and that the whole testimony tending to show such waiver should have been submitted to the jury.

2. The following propositions are summarized from the opinion of Chief Justice CHAMPLIN:

*a*—No one can legally exercise a franchise of a corporation unless authorized so to do by the Legislature.

*b*—All of the powers possessed and privileges enjoyed by corporations are conferred by their charters, or by the statute authorizing their formation under general laws.

*c*—When the statute points out a method of organizing a corporation under general laws, that method must be pursued by a substantial compliance with the statute, and none other can effect a legal incorporation.

*d*—In stock corporations organized for trade, manufacture, or other objects where it is expected that the investment of the capital stock will yield a return of profits by way of dividends or otherwise, the authorized capital stock is the life-blood of the corporation, and the means through which the object of organization is to be accomplished; hence said stock, and the shares into which it is divided, are required to be fixed by the articles of association.

*e*—Two classes of corporations are authorized under the Michigan statutes,—one on the basis of capital stock as a foundation for membership, in which each share represents a voting unit, and the other not upon a stock basis, but in which the membership is personal, and the individual represents the voting unit. The first class comprises all corporations organized for gain or profit upon the capital invested, and may be subdivided into two classes, the first of which is composed of all those corporations whose capital stock is required to be fixed in the articles of association, and the shares specified, and where the whole capital stock must be subscribed before they are fully organized and competent to do business.

*f*—Public policy, as well as the rights of individual members of the corporation, requires that the full amount of capital stock fixed in the law or articles of association should be subscribed when the corporation is formed, unless by special permission of the Legislature it may be afterwards subscribed.

*g*—Such capital stock is a trust fund for the protection of

creditors and those dealing with the corporation, and, to be a fund at all, it must be subscribed; and, if fully paid in, public policy and the rights of stockholders require that such funds should not be diverted from the object to accomplish which the corporation was organized.

*h*—Such capital, though subscribed, need not all be paid in, but the amount to be assessed is usually left to the discretion of the board of directors, who may call in the capital in such installments as to them may seem best, and the statutes usually confer this authority.

*i*—It is this subscribed unpaid capital which the subscribers owe to the corporation that constitutes a trust fund in favor of creditors for the payment of the debts of the corporation; but, if the capital is not actually subscribed, there is no security to that extent for the creditors.

Error to Wayne. (Hosmer, J.) Argued May 13, 1891. Decided October 16, 1891.

*Assumpsit*. Defendant brings error. Reversed. The facts are stated in the opinion.

*F. A. Baker* (*William Aikman, Jr.*, of counsel), for appellant.

*Marston, Cowles & Jerome*, for plaintiff.

CHAMPLIN, C. J. At the first trial of this cause the defendant introduced no testimony, and the court below directed a verdict for the defendant. Upon the review of that record this Court reversed the judgment, and directed a new trial. 83 Mich. 386.

The case has been again tried substantially upon the same testimony upon the part of the plaintiff. The defendant introduced some testimony tending to show that when he subscribed it was represented to him that he should have an opportunity of inspecting the several sites offered before one was accepted, and also the part he took in the meeting held by the subscribers to the paper signed by him, pursuant to the call of the

88 MICH—5.

board of directors. He admits that when he subscribed he was told that the site afterwards adopted was one of the sites in contemplation, but he claims that he was not properly treated by the meeting of the 18th of March, because an adjournment to enable him to investigate other sites offered at that meeting was voted down. He admits that he voted not only the shares represented by his subscription, but also, as proxy, 150 shares which he had subscribed for his sons, and which subscriptions stood in their names. He admits that he requested that one of his sons should be made a director in the corporation to be formed, and that his wish was acceded to, and his son made a director. He admits that he voted against the site which the board of directors recommended as the most available for the purposes of the corporation. He denies that he took any other part thereafter in the proceedings of the corporation, and he denies that he assisted in the organization of the corporation, and testifies that the articles of association were never presented to him to sign, and that he did not sign the articles of association.

The declaration contains two special counts, based upon the agreement which he subscribed, which reads as follows:

"For the purpose of purchasing suitable grounds, erecting suitable buildings thereon, of a permanent character, for fair and exposition purposes, to be upon a plan similar to the Buffalo Exposition, and believing that a corporation with a capital stock of at least $250,000 should be organized for such purpose, the undersigned agree to subscribe for and take stock in such a corporation for such purposes to the amounts set opposite our respective names: *Provided,* that at least the sum of $100,000 shall be subscribed within sixty days from the date hereof, in order to render our agreement hereto binding.

"*Dated Detroit, January 9, 1889.*"

It appears from the original subscription paper introduced in evidence, containing the signatures of the subscribers and the amount subscribed by each, that at the time the defendant signed the subscription there had been already subscribed the sum of $207,000, and thereafter the further sum of $27,500 was subscribed, which latter subscriptions were upon a separate sheet, and under the date of February 9, 1889. At the time some of these subscriptions were made, no act had been passed by the Legislature authorizing the formation of corporations for the purpose of constructing, owning, controlling, and acquiring by lease buildings for exposition or exhibition purposes, but such act was passed by the Legislature and approved February 13, 1889, and ordered to take immediate effect; and it further appears from the testimony that this subscription was made after the act of incorporation had passed, but before any association had been formed under the authority of such act.

It further appears from the testimony that on the 25th day of February, 1889, a notice was mailed to each of the subscribers of the paper above set forth, as follows:

"A meeting of the subscribers to the Exposition Association will be held at the office of Judge Marston, new Whitney block, Tuesday, February 26, 1889, at 2 o'clock, for the purpose of organizing. Your presence is requested

"E. W. COTTRELL,
"GEORGE M. SAVAGE,
"BRUCE GOODFELLOW,
"Committee."

There was no testimony introduced showing that the defendant received this notice, but it appears from the testimony of Mr. Cottrell that he personally notified the defendant of this meeting at his office a day or two previous to the time of meeting, at which time Mr. Walker said he did not know whether he would be there or not; that he would try to come, and, if he did not

come, he would like to have one of his sons on the board. The meeting was held pursuant to the notice, and articles of association were presented, discussed, and adopted, and subscribed by a number of those present, representing $100,000 of the stock, and such articles were recorded in the office of the Secretary of State on the 12th day of March, 1889. They were also subscribed by E. Chandler Walker, a son of the defendant, to the amount of $5,000, and he was named as one of the directors in the articles of association. The board of directors named in the articles of association proceeded to organize as a board, and elected the officers required by the articles. They afterwards issued and mailed to the subscribers the following notice:

"DETROIT, MARCH 9, 1889.

"*Dear Sir:* Subscribers to the Detroit International Fair and Exposition Association are requested to meet with the board of directors at Library Hall, Merrill block, on Monday, the 11th inst., at 8 o'clock P. M., for the purpose of determining upon a location.

"D. M. FERRY, Pres't.
"E. W. COTTRELL, Sec'y."

At the time mentioned a meeting was held, to which meeting the directors made a report with reference to the locations which had been brought to their attention, and in which they favored the location known as the "Field Farm," belonging to Mr. McMillan. After discussing the merits of the different locations, an adjournment was had for one week, to enable the subscribers to investigate the merits of the respective locations presented, which meeting was held on the 18th day of March, 1889. The defendant did not attend the first meeting, but did attend the adjourned meeting. At this meeting one or two new sites were offered, and he moved an adjournment of the meeting for the purpose of examining the new sites. This was put to a vote upon a

stock basis, and he voted the stock which he had sub-
scribed, and also the stock represented by his sons, in all
200 shares. The proposition to adjourn was defeated. A
motion was made to determine the preference of the
stockholders for a site. There were 1,580 shares voted, of
which 1,155 were in favor of what was termed the "Field
Farm" site, and 425 against the proposal; the defendant,
Walker, voting against the Field site. The meeting was
then adjourned. The record of the meeting, as kept by
its secretary, states that the 425 shares above mentioned
were voted for what was known as the "Bressler Site,"
but defendant, Walker, testifies that he did not vote for
the Bressler site, but voted against the Field site.

. It appears further from the testimony that the board
of directors soon thereafter proceeded to purchase the
site from Mr. McMillan, and entered into a contract with
him by which they agreed to pay for such site $2,000 an
acre. The number of acres contained in the site was
69.96. They also entered into contracts for the construc-
tion of buildings and other improvements, and made
assessments on the stock, not only upon those who had
subscribed the articles, but upon the subscribers of the
paper heretofore mentioned, from time to time, until
they had called for the whole amount so subscribed.
The total amount paid in upon subscriptions, up to the
time of commencement of suit, was $236,000, for which
certificates of stock were issued. The defendant was
notified of these calls upon his subscription to the stock,
but he neglected and refused to pay. Before suit was
brought the corporation tendered him a certificate of
stock for $5,000, and demanded payment thereof, but he
refused to accept the certificate, and also refused pay-
ment.

The articles of association provided that the whole
capital stock of the corporation should consist of $500,000,

and the number of shares 5,000. It is not shown clearly by the record that any subscriptions were made subsequent to the organization of the company, and it is a conceded fact that the whole amount of capital of $500,000 has not been subscribed for. It also appears that the assessments upon the subscriptions were based upon the amounts actually subscribed, and not upon the basis of the entire capital of $500,000. It further appears that the whole amount of the capital stock paid in has been invested in the lands and improvements, and that it still owes Mr. McMillan for the land upon the contract in the neighborhood of $110,000.

The corporation held a fair and exposition upon the site purchased by it in the fall of 1889, which appears to have been successful, and it declared a dividend of 5 per cent. upon the subscribed capital. In the following year, 1890, it held another exposition, and netted something like $30,000, which amount it expended in improvements upon the property. One of plaintiff's witnesses testified that the total indebtedness of the company at the time of the trial was about $140,000,—from $130,000 to $140,-000; that the capital stock had been expended in making payments on the land contract, and in making permanent improvements upon the property. He also testified that the stock of the corporation he should think was worth 100 cents on the dollar.

As before stated, the special counts of the declaration are based upon the agreement which Mr. Walker signed, to subscribe for and take $5,000 stock in the corporation, and aver that the corporation accepted the subscription of the defendant set forth in said agreement, and in reliance thereupon proceeded to purchase the land and erect the buildings in accordance with the purpose of the corporation. Both counts allege as a breach that the defendant has wholly neglected and refused to subscribe

and take stock in said plaintiff corporation, and to pay any sum or sums thereon, according to the form and effect of said agreement, to the damage of the plaintiff $10,000. The declaration also contains the common counts in *assumpsit*. It will therefore be necessary to consider, under the special counts, the liability of the defendant to the plaintiff corporation, not as a stockholder, but for the breach of his agreement to subscribe for and take the stock in the corporation, and under the common counts it will be necessary, if the testimony shall warrant it, to determine his liability as a stockholder of the corporation; and in both cases the damages which the plaintiff is entitled to recover form an important consideration.

In order to determine the liability of the defendant under these different claims of the declaration, it will be necessary to advert to the rights and liabilities of members of a corporation, as between the corporation and the members, and also as between persons who enter into a voluntary agreement to subscribe for and take stock in a corporation to be thereafter formed.

No one can legally exercise a franchise of a corporation unless authorized so to do by the Legislature. All the powers they possess and all the privileges they enjoy are conferred by their charters, or the statute authorizing the formation of corporations under general laws. When the statute points out a method of organizing a corporation under general laws, that method must be pursued by a substantial compliance with the statute, and none other can effect a legal incorporation. In stock corporations organized for trade, manufacture, or other objects. where it is expected that the investment of the capital stock will yield a return of profits by way of dividends or otherwise, the capital stock authorized is the life-blood of the corporation. It is the means through which the object of organization is to be accomplished. Hence it

is always the case that the capital stock of such corpora-
tions, and the shares into which it is divided, are required
to be fixed by the articles of association.  There appear
to be two classes of corporations authorized by the laws
of this State:

1. Those organized on the basis of capital stock as a
foundation for membership, in which each share repre-
sents a voting unit.
2. Those organized not upon the stock basis, where the
membership is personal, and the individual represents the
voting unit.

The first class comprises all corporations organized for
gain or profit upon the capital invested, and may be sub-
divided into two classes, the first of which comprises all
those corporations where the law requires the capital
stock to be fixed in the articles of association and the
shares specified, and where the whole capital stock must
be subscribed before they are fully organized and com-
petent to do business.  Of this class the plaintiff corpo-
ration is a type.

The statute (Act No. 6, Laws of 1889, 3 How. Stat.
chap. 120c) authorizing the formation of this corpora-
tion in its second section reads as follows:

" Sec. 2.  Such persons shall, under their hands and
seals, make and subscribe articles of association, which
shall be duly acknowledged, and shall state:
"*First.*  The name of such corporation.
"*Second.*  Distinctly the purpose for which the corpora-
tion is formed.
"*Third.*  The amount of capital stock, and the number
of shares thereof.
"*Fourth.*  The names of the stockholders, their respective
residences, and the number of shares held by each.
"*Fifth.*  The place in this State where the office for the
transaction of business shall be located.
"*Sixth.*  The term of its existence, which shall not
exceed thirty years.
"*Seventh.*  The number of directors, which shall not be

less than five nor more than nine, and the names of those who shall be directors for the first year."

Section 3 provides:

"Before commencing business, the directors shall cause said articles to be recorded in the office of the Secretary of State, who, upon recording the same, shall indorse the date and place of such record thereon, and return the said articles, with such indorsement thereon, to said directors, who shall thereupon cause the same to be recorded in the office of the county clerk of the county where such office is to be located.".

Section 5 enacts:

"The directors may call in subscriptions to the capital stock of such corporation by installments, in such portion and sums, and at such times and places, as they shall think proper, by giving notice thereof as the by-laws shall prescribe; and in case any stockholder shall neglect or refuse payment of any such installment for the space of thirty days after the same shall have become due and payable, and after he shall have been notified in writing by the secretary thereof, the stock of such delinquent stockholder may be sold by the directors at public auction at the office of the secretary of the corporation, giving at least thirty days' notice, in some newspaper published in the county in which its office is located, of the time and place of such sale, and the proceeds of such sale shall be first applied in payment of the installment called for and the expense of such sale, and the residue, if any, shall be refunded to the owner thereof; and such sale shall entitle the purchaser to all the rights of a stockholder to the extent of the shares so bought: *Provided,* that in case the proceeds of such sale shall not equal the amount due upon such stock and the expenses of such sale, then and in that case the corporation may sue for and recover such balance from such delinquent stockholder in an action of *assumpsit* in any court having cognizance of the action."

Section 10 declares:

"The stock of such corporation shall be deemed personal property, and shall be transferred only on the books of the company in such manner as the by-laws of

such corporation shall prescribe; and such corporation shall at all times have a lien upon the stock or property of its members invested therein for all debts due from them to such corporation, which may be enforced by advertisement and sale in the manner herein provided for selling delinquent stock, and all purchasers at such sales shall be entitled to the rights of stockholders."

There is nothing in this act which authorizes the corporation to proceed to do business before the whole capital stock is subscribed. Neither does it authorize or provide for any preliminary subscription for stock, nor any subsequent subscription to its capital stock. In this it is quite different from the other class of stock corporations, where, in exceptional cases, the Legislature has expressly authorized the corporation to proceed to do business before all the capital stock is subscribed. Of this class railroad and mining corporations are types. Under the general railroad laws, the corporation is authorized to do business when a certain sum per mile of the road has been in good faith subscribed, and five per cent. of the amout thereof paid in to the directors named in the articles of association. The affidavit of that fact, made by any two of said directors, is attached to the articles of association. Such articles may be filed in the office of the Secretary of State;—

"And thereupon the persons who have subscribed such articles, and all other persons who shall from time to time thereafter subscribe to or become the holders of the capital stock of said corporation, in the manner to be provided in its by-laws, shall be a body corporate," etc. How. Stat. § 3313.

Section 3315 enacts:

"The board of directors are hereby authorized and required to provide by by-laws for the disposition of its unsubscribed capital stock, and may provide for the election or appointment of agents or employés of said company, and may require of them security for the faithful

performance of their duties, and for the general management of the business and affairs of said company."

The statute authorizing the formation of corporations for mining, smelting, and manufacturing iron, etc., contains the same requirements in order to form the corporation as are contained in the act under which the plaintiff is organized; but section 3 of the act (How. Stat. § 4078) provides as follows:

"It shall not be necessary for the original corporators to subscribe for the entire capital stock, but the portion not subscribed for may be disposed of at any time afterwards by the corporation in such manner as the by-laws of the corporation may prescribe."

Under the general railroad law as it now exists, it has been held by this Court that a subscriber to the stock of a railroad company, when sued on his subscription, may prove in defense the failure of the corporation to secure the requisite amount of subscriptions; and that, unless it has secured the amount per mile required by the statute, a subscriber is not liable to assessments upon his stock. *Monroe v. Railroad Co.*, 28 Mich. 272; *Swartwout v. Railroad Co.*, 24 Id. 389.

Public policy, as well as the rights of individual members of the corporation, requires that the full amount of capital fixed in the law or articles of association should be subscribed when the corporation is formed, unless by special permission of the Legislature it may be afterwards subscribed. The capital stock of the corporation is a trust fund for the protection of creditors and those dealing with the corporation. To be a fund at all, it must be subscribed, and, if fully paid in; public policy and the rights of stockholders require that such funds should not be diverted from the object to accomplish which the corporation was organized. The capital, though subscribed, need not all be paid in, but the

amount to be assessed is usually left to the discretion of the board of directors, who may call in the capital in such installments as to them may seem best, and the statutes usually confer this authority. It is this subscribed unpaid capital which the subscribers owe to the corporation that constitutes a trust fund in favor of creditors for the payment of the debts of the corporation; but, if this capital is not actually subscribed, there is no security to that extent for the creditors. A corporation without subscribed capital would be a mere bubble, without responsibility, and liable to do great mischief in the mercantile world, putting forth false bases of credit, and preying upon the community by reason of such deception.

The rights of every subscriber to the stock depend upon the full amount being subscribed. These enterprises are entered into for the purpose of gain and profit. It is essential to the member that his rights and liabilities as a member should be fixed when he enters into the engagement by his subscription. The capital which is named in the articles of association and the shares specified are known to him when he subscribes, and by this he knows that his subscription comprises an aliquot part of the entire capital of the corporation; that when calls are made they are based upon the whole capital authorized; and that he cannot be called upon to pay more than his share for the purpose required, which would be the case if calls could be made before the whole amount of the capital is subscribed. Such capital is usually fixed at such a sum as the subscribers consider necessary, or that will be required, to secure the object for which the corporation is formed; and it might, and probably would, be disastrous to the enterprise to embark in the undertaking before the whole capital was secured by actual subscriptions. *Railroad Co. v. Johnson,* 30 N. H. 390,

407; *Railroad Co. v. Barker*, 32 Id. 363; *Manufacturing Co. v. Parker*, 14 Id. 543; *Insurance Co. v. Hart*, 31 Md. 60; *Hughes v. Manufacturing Co.*, 34 Id. 332; *Railroad Co. v. Cushing*, 45 Me. 524; *Railroad Co. u. Clarke*, 61 Id. 384; *Railroad Co. v. Preston*, 35 Iowa, 118; *Livesey v. Hotel Co.*, 5 Neb. 50; *Bridge Co. v. Cummings*, 3 Kan. 69; *Railroad Co. v. Hunt*, 39 Conn. 75; *Wontner v. Shairp*, 4 C. B. 404; *Navigation Co. v. Theobald*, 1 Moody & M. 151; *Fox v. Clifton*, 6 Bing. 776; *Railway Co. v. Dalbiac*, 6 Eng. Ry. Cas. 753; *Railroad Co. v. Veazie*, 39 Me. 571; *Fry v. Railroad Co.*, 2 Metc. (Ky.) 323; *Railroad Co. v. Gould*, 2 Gray, 277. In the case last cited Chief Justice Shaw says:

"It is a rule of law, too well settled to be now ques- tioned, that when the capital stock and the number of shares are fixed by the act of incorporation, or by any vote or by-law passed conformably to the act of incorpo- ration, no assessment can be lawfully made on the share of any subscriber until the whole number of shares has been taken;" citing Massachusetts cases.

And he further says:

"This is no arbitrary rule; it is founded on a plain dictate of justice, and the strict principles regulating the obligation of contracts. When a man subscribes a share to a stock, to consist of one thousand shares, in order to carry on some designated enterprise, he binds himself to pay a thousandth part of the cost of such enterprise. If only five hundred are subscribed for, and he can have no assurance which he is bound to accept that the remainder will be taken, he would be held, if liable to assessment, to pay a five-hundredth part of the cost of the enterprise, besides incurring the risk of an entire failure of the enterprise itself, and the loss of the amount advanced towards it." And see cases cited by the court in that case.

The question has long since been settled in this Court in accordance with the above authorities. The point was raised and expressly decided in *Shurtz v. Railroad Co.*, 9

Mich. 269. The railroad law of 1855, although permitting an organization and election of directors before the whole capital stock was subscribed, did not authorize the corporation to proceed with the main design of the corporation until all the stock was subscribed. This statute has been since amended so as to permit the corporation to proceed whenever a certain amount of stock per mile has been in good faith subscribed. The defendant in that case had signed the following subscription:

"We, the undersigned, agree to take the number of shares of stock in the Schoolcraft & Three Rivers Railroad Company which is set opposite our names, respectively, and bind ourselves, our heirs and executors, to pay for the same in monthly installments, to the order of the president and directors of said railroad company, or their agent or attorney, for the purpose of constructing or building said road, whenever called upon so to do, which installments shall not exceed twenty per cent. at any one time; to be paid in one year."

The subscription was made upon a subscription paper circulated by an agent appointed by the board of directors. No books of subscription were opened. The whole amount of stock was never subscribed. The directors called assessments from time to time up to the full amount of each share subscribed. Defendant never paid any portion of his subscription, but on several occasions promised to do so. The suit was brought upon the subscription to the stock above set forth. Mr. Justice CAMPBELL, speaking for the Court, said:

"The principal legal questions arising on this finding relate to the validity of the subscription, and the right to levy assessments upon it, if valid, before all the stock was subscribed."

The learned judge reviewed the general railroad law, and the validity of the subscription made in that case, and held that, inasmuch as it was not made pursuant to the statute, it was no consideration for the promise made

by the defendant, Shurtz. Upon the other question, namely, the right to levy assessments, he said:

"We are also of opinion that, had the case found a legal subscription, any levy of assessments was premature. The case finds expressly that all of the stock was not subscribed. How far the act of 1857 modifies the power to call in subscriptions till this is done is immaterial in this case, as all that was done here preceded the passage of that act. It is quite common in our special charters, and in some of our general laws, to permit corporations to proceed in the exercise of all their powers before their stock is all taken. When this is allowed there is usually an express limitation, unless it is fairly to be deduced from other plain provisions. But the general railroad law (at least as it existed before the amendment referred to) contains no provision from which such an intent can be deduced. It allows each company to fix its own stock, but it must not fall short of $4,000 per mile for flat rail, or $8,000 per mile for heavy rail. When we compare this provision with the requirement that the commissioners shall keep their books open until all the subscriptions are full, and then call a meeting to elect directors, at which they are to act as inspectors, we cannot resist the inference that the act was designed to prevent any company from proceeding without an assurance of genuine capital adequate to insure the building of the road entirely, or far enough to make it a safe security for loans to finish it. Persons subscribing have a right to rely on the completion of the stock subscriptions, as some assurance that their means will not be absolutely thrown away. And it is fairly presumable that broad grounds of public policy, to prevent gambling in inflated securities, and obtaining money under false appearances, were not left out of sight by the Legislature. Several cases were cited on the hearing which held that the subscribers could not lawfully be called on to pay any assessments until either the whole stock or such minimum as the corporate law prescribed should be taken. The reasons given for this rule are convincing, and ought to prevail."

Here was a case of a voluntary subscription, containing an express promise to subscribe and pay for the stock within one year, and the subscriber attended a stockhold-

ers' meeting and voted; and yet this Court held that the subscription was not valid, but, if it was, no recovery could be had until the whole amount of the capital stock had been subscribed. This case was approved upon the first point, upon the question of its validity, in *Carlisle v. Railroad Co.*, 27 Mich. 319.

A pertinent inquiry here is, could the corporation organized under the articles of association set forth in the record be compelled to recognize Walker as a stockholder, or to treat his subscription as valid? In the case last above cited the statute declared that—

"The persons who have subscribed such articles, and all other persons who shall from time to time thereafter subscribe to or become the holders of the capital stock of said corporation, in the manner to be provided by its by-laws, shall be a body corporate."

No by-laws were adopted, and at no formal meeting of the directors were the terms of subscription agreed on; but the commissioners, without holding a formal meeting, agreed upon the form, which defendant subscribed, in which he thereby agreed to subscribe and take the shares, and pay for them as the board of directors might direct and require. The Court said:

"No person can obtain rights of membership in a corporation except in compliance with its charter or governing law, and, if that prescribes any conditions or special methods of becoming a member, the law is imperative. There may be cases of mutual dealing which will estop both parties, but no contract or subscription can be valid if not conforming to the statute. * * * An offer may perhaps be made subject to future acceptance, where the charter does not require the subscription to be made otherwise. But where the manner of subscribing is laid down, it is difficult to find room for any other."

And after citing the case of Shurtz, and also *Howard's Case*, reported in the Law Reports (1 Ch. App. 561), the Court say:

" The Legislature having seen fit, for satisfactory reasons, to declare that the members of the corporation should consist of the original subscribers, and of such other persons as should subscribe or become holders ' in the manner to be provided by its by-laws,' it must follow that, until by-laws should be enacted, there could be no further subscriptions."

In this case the Legislature has seen fit, for satisfactory reasons, to declare that the members of the corporation should consist of the original subscribers, and gives no authority and provides no means for any other persons becoming subscribers to the stock; the intention being that the whole amount should be taken at the time of organization. See *Parker v. Railroad Co.*, 33 Mich. 23; *Northern Cent. Mich. R. R. Co. v. Eslow*, 40 Id. 222. And in *Swartwout v. Railroad Co.*, 24 Mich. 389, this Court again held the doctrine that the whole amount of the capital per mile required by law for that designated portion of the road, must be subscribed before the subscriber to the stock is liable to assessment. I shall revert to this case and to the case of Carlisle further on, upon another point presented by this record.

In the case at bar, as has been before observed, a number of persons signed the articles of association, to the amount of 1,000 shares, and proceeded to name their officers, and file and record their articles, and act as a corporation, without having the full amount of the capital stock named in the articles subscribed; and the question arises whether they are competent to maintain an action against the defendant for not taking and subscribing for the stock according to his agreement. They attempted to organize under the statute, they failed alone in the particular referred to, and the question is whether the defendant can raise the objection against their maintaining this action against him because of this defect in their

88 MICH.—6.

organization. A similar question came under review in
the case of *Swartwout v. Railroad Co.*, 24 Mich. 389. In
that case there was a *bona fide* attempt to incorporate,
but the provisions of law had not been complied with,
and Swartwout had subscribed the stock, and had paid
35 per cent. of his subscription to the corporation, and
had acted as a stockholder. The Court said:

" Where there is thus a corporation *de facto*, with no
want of legislative power to its due and legal existence;
where it is proceeding in the performance of corporate
·functions, and the public are dealing with it on the
supposition that it is what it professes to be, and the
questions suggested are only whether there has been exact
regularity and strict compliance with the provisions of
the law relating to incorporation,—it is plainly a dictate,
alike of justice and of public policy, that, in controver-
sies between the *de facto* corporation and those who have
entered into contract relations with it, as corporators or
otherwise, such questions should not be suffered to be
raised."

See, also, *Carlisle v. Railroad Co.*, 27 Mich. 315; *Jhons
v. People*, 25 Id. 499; *Monroe v. Railroad Co.*, 28 Id. 272;
*Whipple v. Parker*, 29 Id. 379; *Merchants', etc., Bank v.
Stone*, 38 Id. 782; *Wilcox v. Railroad Co.*, 43 Id. 590.

In *Monroe v. Railroad Co.*, 28 Mich. 275, it is
pointed out that a distinction exists between that case
and that of Swartwout. There is a wide difference
between the existence of the company as a corporate
body and the liability of the parties for their subscrip-
tions to the capital stock. As a general rule, where the
capital stock and the number of shares are fixed in the
recorded certificate, no valid assessments or calls can be
made. on the subscription until the whole capital is
taken, unless there be a provision to that effect, either
in the recorded certificate or general law under which
the company is incorporated, and in such case the sub-

scription may be considered to that extent conditional. See *Swartwout v. Railroad Co.*, 24 Mich. 396, 397; *Monroe v. Railroad Co.*, 28 Id. 275, 276.

It is proper,. therefore, to consider in this case, first, whether there is anything in the contract itself which may be regarded as a waiver of this essential. It is claimed, first, that it was. the intent of the subscribers that a corporation, with a capital stock of $250,000 sub-scribed, would contain sufficient capital for the purpose for which the corporation was to be formed, and that in this case more than that amount was subscribed at the time of its organization,—the whole amount, as before stated, shown by the subscription papers, being $254,500; and, further, that the subscribers were willing to be bound, to pay the subscriptions if $100,000 should be subscribed within 60 days from the 9th day of January, 1889, which was done. It will be noticed that the agree-ment did not limit the capital stock to be subscribed at $250,000, but provided that at least the capital subscribed should be that amount. It was, therefore, no breach of the contract that the capital named in the articles of association was $500,000 instead of $250,000. But I can see nothing in the contract which expresses an intent that the subscribers shall be bound to pay their subscrip-tions unless the whole capital, whatever it might be, shall be subscribed for. The intent appearing upon the face of the contract is that a corporation should be formed embracing a capital stock not less than $250,000, and that at least $100,000 of the capital stock should be subscribed for within 60 days from the date of the paper. There is nothing in. this which implies that it was the intent of the subscribers to be bound to pay assessments if $100,000 should be subscribed, although the whole capital stock was not subscribed. The agreement must be read in the light of what the law required should be

done to legally organize the corporation,—that is, that it should have a fixed capital, and the whole authorized capital should be subscribed in the articles. Therefore I see nothing upon the face of the contract which would render the defendant liable to pay for his subscription unless the whole authorized capital was subscribed, in which case the corporation could allot no part of it to him. This becomes pertinent under the special counts, upon the question of damages, for it would be unjust to hold the defendant to a greater liability under his voluntary subscription than he could be held to had he subscribed the articles of association. He is not by reason of such subscription a member, and recovery against him for breach of the agreement will not make him such. Here is the inherent difficulty under the special counts of the declaration. This law authorizes no unsubscribed capital, and places none at the disposal of the corporation to allot to those who have agreed to subscribe before the organization, but have refused to do so. If the capital stock can ever be filled to the full amount fixed in the articles, it must be done by a new agreement between the corporation as one in fact, and those who engage with it knowing the facts, and intending to subscribe for the unsubscribed capital.

This difficulty does not arise in those corporations where the law does not require the whole capital to be subscribed in the first instance, but allows it to be done from time to time, and authorizes the directors to dispose of the unsubscribed capital; and persons entering into an agreement to subscribe for and take shares in such a corporation can compel the corporation to allot shares to them, and it is in a position to carry out its contract, because it has the shares at its disposal; but even in that case, if the shares had all been taken and allotted, a subscription for further shares could not be

enforced. And this distinguishes the present case from *Peninsular Ry. Co. v. Duncan,* 28 Mich. 130. ·That case holds and proceeds entirely upon the theory that the statute authorized a preliminary subscription, and it authorized such preliminary subscribers to organize by complying with certain specified conditions; and Mr. Justice COOLEY, at page 134, says:·

"By any such voluntary subscription to take stock, however, we should naturally understand some mutual agreement by which the promoters severally agree to take and pay for certain shares in the proposed corporation; something, in short, like or similar to the agreement which was actually entered into in the present case. We do not understand that there would be any difficulty at the common law in enforcing the promises contained in an agreement of this general nature against the several promisors, where the object to be accomplished was lawful, where a beneficial purpose was in view, and where it was possible to make to the several promisors the return which their subscriptions called for. In such cases the promises are mutual; acts are done and moneys expended in reliance upon the subscriptions; and the moment the promises are accepted by the organization and action of the corporation to which they are provisionally made, there can generally be no difficulty in their enforcement, if the corporation then has it in its power to give the stock subscribed for, and offers to do so. In such a subscription, thus accepted, there would be all the requisites of a valid contract,—proper parties, and a promise made upon a legal and valuable consideration."

Under the general railroad law, it is possible to make to the several promisors the return which their subscriptions called for. The whole amount of capital stock is not required to be subscribed as a condition precedent to organization, and the directors are allowed to prescribe how unsubscribed stock shall be taken. The corporation is in a position to allot the stock to the subscribers. But the learned justices do not choose to place the liability in that case upon the common-law grounds, but

deduce it from the language of the statute, and hold that the language applies to those who subscribed before the organization as well as to those who did so afterwards; that by force of the statute the subscribers were entitled to the stock if the whole amount of capital had not been subscribed, and the commissioners could only apportion the excess if more than the authorized capital was subscribed. But they further held that the subscription, even then, was ineffectual, unless 5 per cent. had been paid in upon it by the subscriber or some one for him. Without this payment he would not be entitled to participate in the organization of the corporation. He would not be one of the associates, in such a case. Page 143.

I am content to approve of the decision upon the grounds upon which Mr. Justice COOLEY places it, and I agreed in the opinion rendered in this case, and reported in 83 Mich. 386, in reliance upon that case. But I am frank to admit that I failed to distinguish the law which governs corporations under which that decision was made from the law under which this corporation was formed. The mutuality spoken of in such cases is not the mutuality existing between the subscribers with each other, but between the subscribers and the corporation. Had it been an absolute agreement to pay for the stock subscribed in the manner it was, before an organization, it would not have constituted defendant a stockholder, because there was no law authorizing such preliminary subscription; and I am at a loss to know how he can be made liable for failing to perform a promise which, had it been performed, would have been of no binding force.

But, if he could be liable at all for the failure to subscribe and take stock, what damages could be recovered? Is he liable for the par or face value of $5,000 stock in the corporation? If so, it must be that the plaintiff was

the owner of such stock, and had a lawful right to sell and deliver to defendant. It is stated in the record that the certificate was tendered to defendant, which he refused. Nothing in the pleadings or record shows that such tender has been kept good. The title did not pass to defendant. He not only refused the stock certificate, but he refused to subscribe. The corporation, may, if it has a legal right to dispose of its unsubscribed. capital, permit it to be subscribed for and to issue it to any other person. In other words, it holds the title to the property, and is possessed of all the value it contains. It cannot recover in this action the value, and retain the stock. It is laid down in Morawetz on Private Corporations, and also in *Thrasher v. Railroad Co.*, 25 Ill. 393, that, under an agreement to subscribe for a certain amount of stock, the measure of damages is the difference between the par value of the stock agreed to be subscribed for and the market value of such stock. This ought to be the rule where the corporation has unsubscribed capital which it is authorized to dispose of; but the testimony shows that, if such rule is applicable to this case, the plaintiff has suffered no damage for defendant's failure to subscribe, because the plaintiff's witness testified that this stock is worth 100 cents on the dollar, and this is the only testimony as to the value.

The next question to be considered is whether the defendant is liable in *indebitatus assumpsit*. If he is so, it must be upon the ground of estoppel; that by his conduct and actions he has assumed the relation of a. stockholder in the corporation, and has been recognized by the corporation as a member. The testimony upon which this claim of estoppel is based has been mentioned. It was said in *Fredenburg v. Church*, 37 Mich. 478:

"Estoppels never arise from ambiguous facts; they

must be established by those which are unequivocal, and not susceptible of two constructions."

The effect of this conduct may be considered with reference—

1. As to an admission that defendant was a stockholder and member of the corporation.
2. As to the liability of defendant to be assessed before all the stock was subscribed.

There is no dispute npon the testimony in this record that defendant attended what was considered as a meeting of the subscribers to the capital stock, which included those who had joined in the organization, and others like him, who had agreed to subscribe for and take stock in the corporation. He acted, to all intents and purposes, as a stockholder upon the occasion, and for the purpose of considering a corporate act. I think there can be no question but that the corporation recognized him as a stockholder and member, and that he recognized that relation himself. The estoppel, so far as membership is concerned, is mutual and binding upon both parties.

But whether he was liable to assessments depends upon other considerations. He was not liable to be assessed upon his stock, unless he has waived the condition upon which such assessments in a corporation like this are based, and that is that the whole capital stock must first be subscribed. See Michigan authorities before referred to. Did he intend by what he did to waive that condition? The burden of proof is upon the plaintiff to show waiver. The plaintiff must show that the defendant had knowledge of the facts from which the intention can be inferred to waive a right given him by law. Waiver is voluntary, and implies an election to dispense with something of value, or forego some advantage which he might, at his option, demand or insist upon. *Hahn v.*

*Miller*, 60 Iowa, 96 (14 N. W. Rep. 119); *Warren v. Crane*, 50. Mich. 300; *Waldron v. Murphy*, 40 Id. 668. The question of waiver is one of intent, and is a proper subject of inference from surrounding circumstances, and it may be proved by circumstances as well as by direct testimony. *Hibernia Ins. Co. v. O'Connor*, 29 Mich. 241; *Cobbs v. Association*, 68 Id. 465. And where it is claimed to be established by conduct and circumstances from which different minds might draw different conclusions, the question whether waiver is made out or not is one for the jury. *Hale Manfg. Co. v. American Saw Co.*, 43 Mich. 250; *Chapman v. Colby*, 47 Id. 46; *Cobbs v. Association*, 68 Id. 465.

Whether the defendant intended to waive the requirement that all of the stock should be subscribed before he should be called upon to pay would depend upon the knowledge which he had that it had not all been subscribed, and, further, upon the acts and conduct of defendant tending to show that he was willing and desirous that the main purposes of the corporation should be proceeded with without such stock being subscribed. The record before us upon this trial does not establish conclusively these facts, and the whole testimony tending to show waiver should have been submitted to the jury.

We are also asked to review our decision upon the question as to whether or not there could be a personal liability against a subscriber in this corporation for the stock subscribed by him, the defendant insisting that the remedy pointed out in the statute before quoted is exclusive, and that no action would lie to recover upon subscriptions for stock until after it had been sold for a failure in payment, and then only for the deficiency. Upon this point I am satisfied that our decision in the case when here before was correct.

For the error committed in not submitting the testi-

mony tending to show a waiver to the jury, I think the judgment should be reversed, and a new trial granted.

McGrath and Grant, JJ., concurred with Champlin, C. J.

Long, J. *(dissenting)*. This case was before this Court at the October term, 1890, and is found reported in 83 Mich. 386.

Upon the former trial defendant had verdict and judgment by direction of the court. The judgment was reversed by this Court, and a new trial ordered. The case has again been tried in the Wayne circuit court, where the plaintiff had verdict and judgment by direction of the court. The facts are fully stated in the former opinion, and no new or additional facts are now presented by this record.

We can only reiterate what was said in the former opinion, that the action is not brought to recover against a stockholder as such, but upon the agreement to pay the sum of $5,000 to the use of the corporation thereafter to be organized, and for the purposes named in the contract.

Counsel for defendant present their brief, which, in effect, is a reargument of the questions raised and decided upon the former hearing, and we do not feel called upon to repeat or reargue the questions which were there decided. We must adhere to our former opinion.

The judgment should be affirmed.

Morse, J., concurred with Long, J.