ATTORNEY GENERAL, *ex rel.* O'HARA, *v.* MONTGOMERY.

1. Judgment—Collateral Attack—Jurisdiction.
   Action of a tribunal which has jurisdiction to act may not be drawn in question collaterally but where there is a want of jurisdiction such lack may be taken advantage of at any time.

2. Quo Warranto—Moot Case—Subsequent Conviction of Infamous Crime.
   On *quo warranto* to try title to office of county clerk after relator had been removed, case must be decided as of condition prevailing at time information was filed, hence case is not moot at least for period from time information was filed until relator's subsequent conviction of an infamous crime.

3. Officers—County Clerks—Bonds—Vacancies.
   County clerk's failure to give bond as soon as demanded, under circumstances disclosed by record *held*, not to create vacancy in such office although it might possibly have been ground for circuit court declaring office vacant.

4. Same—County Clerk—Removal.
   A county clerk is a county officer who may be removed from office by the governor (1 Comp. Laws 1929, § 3353).

5. Same—Removal—Hearing.
   To remove a county clerk from office there must be charges made, service of same on occupant and a hearing had at which he is entitled to be heard.

6. Same—Removal.
   A removal from office is a deprivation thereof by the act of a competent superior officer acting within the scope of his authority.

7. Same—Removal.
   One may not be removed from an office he is not in.

8. Same—Vacancy.
   An office is vacant when it is empty, when it is unoccupied, when there is no one who, of right, may exercise its functions and if it is vacant, no removal proceedings are necessary.

9. SAME—VACANCY.

An office becomes vacant by the conduct, action or status of the erstwhile occupant.

10. SAME—REMOVAL—VACANCY.

County clerk may be removed from office upon conviction of a felony but the office is vacant upon conviction of its occupant of an infamous crime (1 Comp. Laws 1929, §§ 3350, 3353).

11. SAME—VACANCY.

In providing that an office shall become vacant upon conviction of incumbent of an infamous crime, statute does not provide that somebody must declare a vacancy exists upon conviction, notwithstanding he may ultimately succeed in establishing his innocence since respect for laws and confidence of people in public officers upon which security of government depends cannot be extended to an officer convicted of a felony.

12. SAME—CONVICTION OF FELONY—APPEAL.

Fact that law allows an appeal from a conviction of felony does not weigh in favor of retaining incumbent of an office so convicted in that position pending an appeal.

13. CRIMINAL LAW—INFAMOUS CRIMES—PUNISHMENT.

Whether a crime is infamous or not is determined by the consequences to the individual by the punishment prescribed for such offense, not by the nature of the offense.

14. SAME—INFAMOUS CRIMES.

Crimes subject to infamous punishments are infamous crimes, and the term infamous crime means any crime punishable by imprisonment in the State prison.

15. SAME—CONVICTION—JUDGMENT.

As commonly used and as used in the cases and criminal statutes a conviction in a criminal case is the finding of guilt and the judgment of the trial court is the sentence or declaration of consequences to the convict of the fact thus ascertained (3 Comp. Laws 1929, §§ 17130, 17329, 17341, 17346, Act No. 328, § 5, Pub. Acts 1931).

16. COURTS—JUDGMENT—OPINIONS—LAW OF CASE.

The adjudication of the court, not the language of the writer of an opinion, establishes the law of the case.

17. JURY—NUMBER OF JURORS.

At common law, a jury was not always made up of 12 persons.

18. WAIVER—DEFINITION.

A waiver is an intentional relinquishment of a known right with knowledge of its existence and an intention to relinquish it.

19. SAME—CRIMINAL LAW.

The doctrine of waiver is quite as broad in criminal cases as in civil cases.

20. JURY—WAIVER—CONSTITUTIONAL LAW—CRIMINAL LAW.

Although the constitutional right to a trial by jury shall remain, it may be waived in a criminal case when the statute so provides (Const. 1908, art. 2, §§ 13, 19, art. 5, § 27, 3 Comp. Laws 1929, § 17131).

21. SAME—WAIVER—LEGISLATURE.

The legislature may provide for waiver in trials by jury in cases within the jurisdiction of courts other than courts of justices of the peace.

22. CRIMINAL LAW—PLEA OF GUILTY.

An accused has a right by his own voluntary act, to come into court and plead guilty and thus surrender his liberty.

23. SAME—JURY—WAIVER.

An accused has a right, by complying with the statute in relation to waiving trial by jury, to waive his constitutional privilege of a right to trial by jury in a court of record and consent that judgment be rendered by the court (3 Comp. Laws 1929, § 17131).

24. SAME—COURTS NOT OF RECORD—TRIAL WITHOUT JURY.

An accused has a right to waive a trial by jury in courts not of record and to insist upon and enforce his right to be tried by the court without a jury.

25. JURY—WAIVER—TRIAL BY LESS THAN 12 JURORS.

Since trial by jury may be orally waived entirely, an accused may consent to be tried by a jury of 11 instead of 12 persons in a court of record.

26. CRIMINAL LAW—WAIVER—DISCRETION OF COURT.

Constitutional and statutory provisions, designed for the welfare and protection of the accused, may be waived, in matters of form and substance, when jurisdiction has been acquired and within such limits as the trial court, in its discretion, may permit.

27. JURY—WAIVER.

The right of trial by jury is a privilege which may be waived by the voluntary act of the accused.

28. STATE—COMMON LAW—SOVEREIGNTY.

In early English common law the king was the source of sovereignty, the fountain of justice, and the head of the church but government here derives its powers from the consent of the governed.

29. CONSTITUTIONAL LAW—LEGISLATURE.

The legislative authority of a State can do anything which it is not prohibited from doing by the people through the Constitution of the State or the United States.

30. SAME—STATE.

The Constitution of a State is not a grant of power but is a limitation upon authority.

31. JURY—WAIVER—CONSTITUTIONAL LAW.

County clerk charged with felony whose counsel consented to proceed with trial by jury of 11 persons after one of the jurors became ill *held,* to have waived his constitutional privilege to jury of 12.

32. QUO WARRANTO—TITLE OF OFFICE—JURY.

Defendant in *quo warranto* proceedings, who was appointed to office of county clerk following former incumbent's conviction of felony *held,* entitled to such office notwithstanding verdict of conviction was that of 11 jurors, where plaintiff herein had consented to proceed with trial upon illness of one of the original 12.

Information in the nature of *quo warranto* by David H. Crowley, Attorney General, upon the relation of Elmer B. O'Hara, against Henry A. Montgomery to determine title to the office of county clerk of Wayne County. Submitted April 21, 1936. (Calendar No. 38,784.) Judgment for defendant June 4, 1936.

*George A. Kelly* and *Walter E. Kelly,* for relator.

Oscar C. Hull (*John C. Bills* and *Fred G. Dewey*, of counsel), for defendant.

POTTER, J.   December 10, 1935, the attorney general, on the relation of Elmer B. O'Hara, filed an information in the nature of *quo warranto* in this court against Henry A. Montgomery to show by what authority he, the said Montgomery, claimed to hold the office of county clerk of Wayne county.

December 24, 1935, the defendant filed an answer showing that though Mr. O'Hara was duly elected to the office of county clerk of Wayne county at the November, 1932, election and reelected to that office at the November, 1934, election, relator failed to give the official bonds required of him and that he was convicted November 4, 1935, of a felony, in the circuit court of Macomb county, and for these reasons the circuit judges of the county of Wayne removed the relator from the office of county clerk of Wayne county and declared said office vacant, and defendant was, December 4, 1935, duly and regularly appointed to fill the vacancy in said office for the unexpired term; that he accepted said office and qualified and was thus lawfully holding the office.

The facts involved were stipulated by written stipulation filed in this court February 11, 1936. Subsequently, on March 6, 1936, a stipulation of additional facts was filed showing that February 8, 1936, relator was found guilty of certain infamous crimes by a jury on his trial in the recorder's court for the city of Detroit; on February 14, 1936, relator was sentenced by the court to confinement in the Michigan State prison; and that January 23, 1936, the circuit judge acting in Macomb county set aside the verdict of guilty rendered against relator and granted him a new trial on the ground investi-

gation disclosed evidence of improper conversation between one of the jurors in said case and a third party during the progress of said trial.

Relator was convicted in the circuit court of Macomb county by a verdict of 11 jurors. November 1, 1935, Frank Hacker, one of the members of the jury impaneled and sworn to try the relator in the criminal case in the circuit court for Macomb county, was sick and not able to attend court. A physician's certificate was filed indicating the juror might not be able to return for some days. The trial judge said:

"It is now agreed, I believe, that the respondent will waive the further presence of this juror and proceed to the remainder of the trial before the remaining 11 jurors. Is that correct?" To which counsel for respondent answered: "That is correct, your honor." The trial judge then said: "A journal entry may be made to that effect, and we will proceed to the trial." To which counsel for respondent replied: "Yes, your honor."

On November 2, 1935, an order was entered in the journal of the circuit court for Macomb county:

"Due to the serious illness of one of the jurors, to-wit: Frank G. Hacker, whereupon the respondent and his counsel waived the further presence of said juror and consent to proceed to try the cause before the remaining 11 jurors."

The stipulation of facts filed herein shows:

"That during the course of said trial, to-wit, on the 1st day of November, 1935, one of the jurors was excused due to illness, and said relator and his counsel waived the further presence of said juror and consented to proceed to try the cause before

the remaining 11 jurors, which appears from the journal entry for said date as follows:

" 'In this cause the parties being again present in court and the jury heretofore impaneled in this cause being again present in court, whereupon the trial of the above entitled cause was adjourned to one o'clock in the afternoon and due to the serious illness of one of the jurors, to-wit: Frank G. Hacker, whereupon the respondent and his counsel waived the further presence of said juror and consent to proceed to try the cause before the remaining 11 jurors, thereupon the jurors sat and heard further proofs and allegations of the parties, trial being adjourned to Saturday morning, November 2, 1935.'

"On the 4th day of November, 1935, at a session of said circuit court for the county of Macomb held on that day, said jury of 11 found the relator guilty of the crime of bribery of a public officer as charged."

It is claimed we may not inquire into the legality or regularity of Mr. O'Hara's conviction in this proceeding, that to attack his conviction in the criminal case in Macomb county would constitute a collateral attack and such conviction may not here be drawn in question; that we may no more question the regularity of that conviction because it was by 11 jurors than call it in question for errors by the trial court in the admission or exclusion of testimony, or in the charge of the trial court, or because of the failure of the trial court to direct a verdict. There is a clear distinction between those cases in which a verdict is attacked for irregularity and those in which it is attacked for want of jurisdiction. It is well settled that where a tribunal has jurisdiction and has acted, its action may not be drawn in question collaterally though it may be subject to direct attack. But where there is a want of jurisdiction, such lack of jurisdiction may be taken advantage of at any time. Here it is contended Mr. O'Hara was not tried before a regularly constituted tribunal; that the court lost jurisdic-

tion to proceed with the trial; that 11 jurors were wholly without power and authority to render any verdict at all because under the Constitution and laws of this State they did not constitute a legal jury.

It is contended by defendant that inasmuch as relator has, since the appointment of defendant as county clerk of Wayne county, been convicted in the recorder's court of Wayne county of other infamous crimes and has been sentenced to Michigan State prison, this case is moot. Decision in this case as to defendant's right to hold the office of county clerk is governed by the conditions prevailing at the time the information against him was filed, and the right to the office and its emoluments is in dispute at least for the time between defendant's appointment and relator's conviction February 8, 1936.

The bond which it is claimed relator failed to give was not an official qualifying bond. His failure to give it as soon as demanded, under the circumstances disclosed by this record, did not create a vacancy in the office of county clerk, *Toy, ex rel. Elliott,* v. *Voelker,* 273 Mich. 205, though it may have been ground for the circuit court declaring the office vacant; a question we find it unnecessary to pass upon.

A county clerk is a county officer who may be removed from office by the governor. 1 Comp. Laws 1929, § 3353. In order to remove a county clerk from office, there must be charges made, service of the same upon the occupant, and a hearing had at which the occupant is entitled to be heard. A removal is a deprivation of office by the act of a competent superior officer acting within the scope of his authority. If the office of county clerk was vacant, relator could not be removed therefrom.

One may not be removed from an office he is not in. An office is vacant when it is empty,—when it is unoccupied,—when there is no one who, of right, may exercise its functions. No proceedings under the removal statute were proper or necessary if the office was vacant. The office became vacant by the conduct, action or status of the erstwhile occupant. The statute of removal provides the governor may remove a county clerk from office "whenever it shall appear *by a certified copy of the judgment of a court of record of this State* that such officer, after his election or appointment, shall have been convicted of a felony," while the statute relating to vacancies provides the office shall become vacant upon the conviction of the occupant of any infamous crime. 1 Comp. Laws 1929, § 3350.

The reason for the enactment of Act No. 172, Laws of 1851 (Ex. Sess.) (1 Comp. Laws 1929, § 3350), providing that every office shall become vacant upon the conviction of the incumbent of any infamous crime is well stated in *State, ex rel. Anderson,* v. *Fousek,* 91 Mont. 448 (8 Pac. [2d] 791, 84 A. L. R. 303), where it was held the underlying principle is that the security of government depends upon respect for laws and the confidence of the people in public officers. The legislature has declared, in effect, that that confidence cannot extend to an officer convicted of a felony. *State, ex. rel. Blake,* v. *Levi,* 109 W. Va. 277 (153 S. E. 587). Nor can the people generally have proper respect for laws if their officers treat the laws with indifference. The reason for the rule applies equally to one convicted under the Federal law and under the State law. Act No. 172, Laws of 1851 (Ex. Sess.) (1 Comp. Laws 1929, § 3350), does not say an officer may be removed from office. It does not

provide that somebody must declare a vacancy therein exists.   It establishes a legislative rule, a declaration that every office shall become vacant before the expiration of the term of such office upon the conviction of the incumbent of any infamous crime.   When the incumbent of the office during the term thereof is convicted of any infamous crime, his office thereby becomes vacant.

An innocent man who is unjustly convicted of a felony is doubly unfortunate, but that he may ultimately succeed in establishing his innocence does not entitle him in the meantime to hold on to a public office.   The law allows an appeal from a conviction of felony, but if the person so convicted is the incumbent of a public office, these considerations do not weigh in favor of retaining him in that position pending an appeal.   *McKannay* v. *Horton,* 151 Cal. 711 (91 Pac. 598, 13 L. R. A. [N. S.] 661, 121 Am. St. Rep. 146).

Whether a crime is infamous or not is not determined by the nature of the offense (2 Bouvier's Law Dictionary [Rawle's 3d Rev.], p. 1553, 1554), but by the consequences to the individual by the punishment prescribed for such offense, *Butler* v. *Wentworth,* 84 Me. 25 (24 Atl. 456, 17 L. R. A. 764). Crimes subject to infamous punishments are infamous crimes, and the term "infamous crime" means any crime punishable by imprisonment in the State prison.   *Ex parte Wilson,* 114 U. S. 417 (5 Sup. Ct. 935); *Mackin* v. *United States,* 117 U. S. 348 (6 Sup. Ct. 777); *Parkinson* v. *United States,* 121 U. S. 281 (7 Sup. Ct. 896); *United States* v. *DeWalt,* 128 U. S. 393 (9 Sup. Ct. 111); *Medley, Petitioner,* 134 U. S. 160, 169 (10 Sup. Ct. 384); *In re Mills,* 135 U. S. 263, 267 (10 Sup. Ct. 762); *In re Claasen,* 140 U. S. 200, 204, 205 (11 Sup. Ct. 735).

It is claimed relator was not convicted of an infamous crime; that to have been convicted there must have been a judgment of the trial court. The judgment of the trial court in a criminal case is the sentence. There is a difference in the language of the removal statute and the vacancy statute,—the one providing for a certified copy of the judgment of a court of record; the other only for conviction of an infamous crime.

"The conviction is the finding of guilt. 1 Bishop Crim. Law, § 963; *Stevens* v. *People,* 1 Hill (N. Y.), 261; *State* v. *Volmer,* 6 Kan. 379; *Nason* v. *Staples,* 48 Me. 123; *Commonwealth* v. *Lockwood,* 109 Mass. 323 (12 Am. Rep. 699). As is said by Gray, J., in *Commonwealth* v. *Lockwood,*—

" 'The ordinary legal meaning of "conviction," when used to designate a particular stage of a criminal prosecution triable by a jury, is the confession of the accused in open court, or the verdict returned against him by the jury, which ascertains and publishes the fact of his guilt; while "judgment" or "sentence" is the appropriate word to denote the action of the court before which the trial is had, declaring the consequences to the convict of the fact thus ascertained.'

"It is the declaration of consequences, only, that is bad; but there is no reversal, the conviction stands as evidence of the fact, and the statute is satisfied." *People* v. *Adams,* 95 Mich. 541.

"*Convicted means* when a person has been indicted by a grand jury, tried by a court and jury, and *found guilty of the offense charged in the indictment.*" *Egan* v. *Jones,* 21 Nev. 433 (32 Pac. 929).

This, in effect, was the holding in *People* v. *Knapp,* 26 Mich. 112; *People* v. *Farrell,* 146 Mich. 264; *People* v. *Morlock,* 234 Mich. 683, and the sense in which the term is used in the criminal statutes, 3 Comp. Laws 1929, §§ 17130, 17329, 17341, 17346, and Act No. 328, Pub. Acts 1931, § 5, and accords with the common use of the language.

It is claimed defendant was not convicted of an infamous crime because no jury found him guilty; that a constitutional jury of 12 is an essential part of the mandatory tribunal for the trial of criminal cases in courts of record and cannot be waived by the defendant consenting to proceed with 11 jurors.

In *Hill* v. *People,* 16 Mich. 351, defendant was convicted of murder. After conviction it was discovered one juror was an alien. Motion was made for a new trial. The trial court found the juror an alien but refused to grant a new trial. Defendant brought error. There was no claim defendant had knowledge, until after trial and conviction, the juror was an alien. The case was reversed because an alien sat on the jury. Justices CHRISTIANCY, COOLEY and GRAVES discussed the question of waiver, and pointed out that waiver could be applied only in those cases where it was competent to stipulate in advance for a trial before a defective jury; that the doctrine of waiver rested upon assent and, under our Constitution, in civil cases, the parties could waive the objection or stipulate for a trial by a jury of less than 12 *"since they can waive the right of a jury trial altogether, and are held to have done so unless it is demanded."* They discussed the theory of trial by jury of criminal cases, and concluded:

"It is the duty of courts to see that the constitutional rights of a defendant in a criminal case shall not be violated, however negligent he may be in raising the objection. It is in such cases, emphatically, that consent should not be allowed to give jurisdiction."

The court approved *Cancemi* v. *People,* 18 N. Y. 128, in which the parties stipulated for a trial by jury of 11 persons and the court held the accused was incompetent to so stipulate.

The decision upon the question involved in *Hill* v. *People, supra,* was directly opposite to that of the Supreme Court of the United States and established by the great weight of authority in England and America. *Kohl* v. *Lehlback,* 160 U. S. 293 (16 Sup. Ct. 304).

Waiver of trial by jury in a criminal case was not involved in *Swart* v. *Kimball,* 43 Mich. 443, though the court said of trial by jury:

"And even the accused cannot waive any one of the essentials. *Work* v. *State,* 2 Ohio St. 296 (59 Am. Dec. 671); *Cancemi* v. *People,* 18 N. Y. 128; *Hill* v. *People,* 16 Mich. 351; *Allen* v. *State,* 54 Ind. 461."

In *McRae* v. *Railroad Co.,* 93 Mich. 399 (17 L. R. A. 750), there was a verdict for plaintiff. One of the jurors who had been ill was discharged by order of the court *against the protest of defendant's counsel,* and the trial directed to proceed with the 11 remaining jurors. The 11 jurors rendered verdict. Error was assigned upon the trial court's order discharging the juror. On argument here counsel were confined to one question, Did this amount to a mistrial? Notwithstanding a multiplicity of citations and a plethora of verbiage the court held Act No. 142, Laws of 1861, was an unconstitutional exercise of that legislative power expressly delegated to it by the Constitution of 1850, art. 4, § 46, that "The legislature may authorize a trial by a jury of a less number than twelve men."

It might well have been held the legislature, having the constitutional power to provide for trial by a jury of less than 12, had the power to prescribe under what circumstances a jury of less than 12 should be sufficient. It was said: "As well might the legislature have attempted to provide for the rendition of a verdict by a less number than 12,"

which is what the Constitution authorized the legislature to do. Const. 1850, art. 4, § 46.

In none of the cases commented on above was the question of waiver of the right of trial by jury by consent of the parties and the trial court involved. In each of them the discussion was *obiter dictum,*— language not necessary to a decision of the case. In the first case, there was no knowledge by the defendant of the juror's alienage until after verdict; in the second, waiver was not directly or indirectly involved; and in the last, the trial proceeded *against defendant's vigorous protest.* The question of waiver was not adjudicated. It is the adjudication of the court,—not the language of the writer of an opinion,—that establishes the law of the case.

The Constitution 1908, art. 2, § 13, provides:

*"The right of trial by jury shall remain,* but shall be deemed to be waived in all civil cases unless demanded by one of the parties in such manner as shall be prescribed by law,"

And Const. 1908, art. 2, § 19, provides:

"In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, *which may consist of less than twelve men in all courts not of record;* to be informed of the nature of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to have the assistance of counsel for his defense; and in courts of record, when the trial court shall so order, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal."

Const. 1908, art. 5, § 27, provides:

"The legislature may authorize a trial by a jury of a less number than twelve men."

England was divided into counties, these counties divided into hundreds, and these hundreds into tithings or towns. Ten freeholders with their families composed one tithing.

"These all dwelt together, and were sureties or free pledges to the king for the good behavior of each other; and, if any offense was committed in their district, they were bound to have the offender forthcoming." 1 Blackstone's Commentaries (Cooley's Ed.), p. 112.

"One of the principal inhabitants of the tithing is annually appointed to preside over the rest, being called the tithing-man, * * * being supposed the discreetest man in the borough, town, or tithing." 1 Blackstone's Commentaries (Cooley's Ed.), p. 114.

"As ten families of freeholders made up a town or tithing, so ten tithings composed a superior division, called a hundred, as consisting of ten times ten families. The hundred is governed by an high constable, or bailiff, and formerly there was regularly held in it *the hundred court for the trial of causes.* * * * In some of the more northern counties these hundreds are called wapentakes." 1 Blackstone's Commentaries (Cooley's Ed.), p. 114.

See, also, 1 Hume, History of England, pp. 46, 47.

Proceedings by jury in criminal cases at not too early common law were by inquest or inquiry of the inhabitants of the hundred or wapentake. The head men of each vill or tithing, assembled together, spoke for the hundred. By analogy to the civil organization in early England, a jury ought to have been made up of ten persons. These hundreds, through their jurors or representative men, charged those suspected of offenses. Thus,—

"The jurors" of the hundred of Eastwivelshire (A. D. 1201) "say that they suspect William Fisman of the death of Agnes of Chilleu, * * * And the

four neighbouring townships being sworn, suspect him of it. It is considered that he purge himself by water under the assize." 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 3.

"William Burnell and Luke of the Well are suspected (A. D. 1201) of the burglary at the house of Richard Palmer by the jurors of the hundred, and by the four neighbouring townships, which are sworn." 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 3.

In *Robert of Waltorville's Case* (A. D. 1203), Robert "offers to the king one mark of silver for a lawful inquest of the country, (to be made) by such as are not the Abbot of Peterborough's men." 1 Select Pleas of the Crown (Selden Soc. Pub.), pp. 48, 49.

In *Reiner Read's Case* (A. D. 1203), defendant "offers the king two marks for an inquest by the county and lawful men of the town of Shrewsbury." 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 35.

In *Ralph Gille's Case* (A. D. 1202), "The 12 jurors presented in their verdict" certain things. 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 16.

In *Henry de Vere's Case* (A. D. 1220), "It is considered that the appeal does not lie, but let 12 free and lawful and discreet men be summoned by whom (the truth may be made known), and who are not related to Henry, nor to Roger or Thomas, and who will not for hate or love conceal the truth." 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 140.

A jury was not always made up of 12 persons. In the *Case of Thomas, Hubert's son* (A. D. 1221), defendant "will not put himself upon the country. And the 12 jurors say that he is guilty of that death, and 24 knights (other than the 12) chosen for this

purpose say the same. Therefore let him be hanged.'' 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 99.

In *Thomas of the Heath's Case* (A. D. 1221), defendant was ''taken on an indictment for thefts and other misdeeds * * * and will not put himself upon his country. The jurors say upon their oath that they suspect him. * * * And 24 knights chosen for the purpose say the same as the said 12 jurors. * * * Therefore let him be hanged.'' 1 Select Pleas of the Crown (Selden Soc. Pub.), pp. 100, 101.

In *William of Barreville's Case* (A. D. 1220), defendant ''arrested and imprisoned for ill fame, puts himself upon the county of Essex, or of Norfolk, or of Southampton, * * * Afterwards he puts himself upon the county of Surrey, or upon all the men of England that know him. * * * On the quindene of Easter came 24 knights of the county of Surrey at the king's summons, and they say upon their oath that they believe him to be a thief and a bad man. * * * And since he put himself upon them, let him be hanged.'' 1 Select Pleas of the Crown (Selden Soc. Pub.), pp. 127, 128.

Glanville, who wrote about A. D. 1187, says:

''When the assise proceeds to make the recognition, the right will be well known either to all the jurors, or some may know it, and some not, or all may be alike ignorant concerning it. If none of them are acquainted with the truth of the matter, and this be testified upon their oaths in court, recourse must be had to others, until such can be found who do know the truth of it. Should it, however, happen that some of them know the truth of the matter, and some not, the latter are to be rejected, and others summoned to court, until 12, at

least, can be found who are unanimous.'' Glanville (Beames Ed.), p. 53.

This was in civil cases concerning a service, or land, or some similar matter. It is doubtful if in criminal cases the court could afforce the assize.

In Amos' edition of Fortescue's De Laudibus Legum Angliæ, p. 99, it is said:

''In ancient times it was in the power of the judge, when there was a division of opinion among the jurymen, to afforce the assize, that is, to dismiss the minority and to substitute new jurors continually until an unanimous decision of 12 persons was obtained. (Glanville, lib. 2, chap. 17; Bracton, lib. 4, chap. 19; Fleta, p. 230.) So, in ancient times, verdicts were often taken according to the voice of the majority, or, as it was termed, 'ex dicto majoris partis.' (2 Hale, Pleas of the Crown, p. 297; Fitzherbert's Abridgment, Verdicts, 40; Brooke's Abridgments, Jurors, 53.) However, it became settled by a solemn decision in the reign of Edw. III that a verdict by less than 12 jurors was nugatory. (41 Ass. 11.) And it is doubtful whether the contrary rule ever prevailed in prosecutions. (Fleta, p. 52; Kelham's Briton, p. 42.)''

The Englishman's Right, reprinted by Rollins from the edition of 1772; Spooner's Trial by Juries (1852); History of Trial by Jury, Forsyth (1852); History of the Jury System, Lesser (1894); Trial by Jury and its Development, Thayer (1898), being chapter 2 of A Preliminary Treatise on Evidence at the Common Law; Reeves' History of English Law; Holdsworth's History of English Law; Pollock & Maitland's History of English Law, as well as Coke, Blackstone, and others, indicate unsatisfactory results of research into the origin of trial by jury.

Reeves contends the jury obtained among the Scandinavians as early as 820 A. D., was carried by Rollo and his followers to Normandy and transplanted by the Normans to England. He says:

"The earliest mention we find of anything like a *jury*, was in the reign of William the Conqueror, in a cause upon a question of land, where *Gundulph*, bishop of *Rochester*, was a party." 1 Reeves' History of English Law (1787) (Finlason's Ed.), p. 137.

The evolution of the petit jury is discussed by Pollock & Maitland (2 History of English Law, pp. 614–630), and by Holdsworth (1 History of English Law (3d Ed.), pp. 323–327). According to Pollock & Maitland, jury trial was not particularly popular when first introduced. They say (p. 629):

"We must wait for a Sir John Fortescue to sing the lauds of the trial by 12 men."

Amos, in his notes on Fortescue's De Laudibus Legum Angliæ, chap. 20, p. 65, says:

"A learned controversy has been sustained upon the question, whether the trial by jury was in use among the Saxons. (Spelman's Gloss, Voc. Jurata; Hickes's Dissertatory Epistle on Saxon Literature; Preface to Wilkins's Leges Anglo-Saxonica; Brady's History of England; Hallam's Middle Ages, ch. 8; Reeves' History of the English Law, pt. 1, chap. 1.)"

But it seems evident that by the law of the Anglo-Saxons, who governed England before the accession of William the Conqueror, trial by jury was unknown. Forsyth says:

"In the infancy of the institution the number seems to have fluctuated according as convenience or local custom required." Forsyth, History of Trial by Jury, p. 131.

And he calls attention to juries of six, eight and sixteen.  Forsyth, History of Trial by Jury, pp. 132, 133.

There is no doubt trial by jury was originally a trial by the country, by inquiry of the people of the vicinage.  Rights were determined by those who were most likely to have knowledge of the facts and who pronounced judgment on their own knowledge of the guilt or innocence of the accused.  Where a crime was committed and the accused was caught in the act, he might be summarily executed because the country was satisfied of his guilt.  Patrick Henry, 4 Elliott's Debates, pp. 163, 164.

"Thomas of Lyminge (A. D. 1220), who was arrested along with robbers at St. Albans, comes and says that he has no lord and is not in frank-pledge and has no pledge. * * * And because there is no one point in his favour and he will not put himself on the country, it is considered that he be hanged." 1 Select Pleas of the Crown (Selden Soc. Pub.), p. 134.

Juries were drawn from the vicinage because such juries were presumed to have the best and most certain knowledge of the facts to be determined.  Forsyth, History of Trial by Jury, p. 158.  That a juror had personal knowledge of facts in dispute was not sufficient to render him incompetent to serve as a juror.  1 Salk. 405 (91 Eng. Rep. 352).

Forsyth agrees with Reeves that we owe the germ of the idea of jury trial to the Normans who derived it from the Scandinavian tribunals where the number 12 was always held in great veneration (Forsyth, History of Trial by Jury, p. 4), but disagrees with Hume who thinks the germ of juries existed in the time of Alfred (871–901), (1 Hume, History of England, p. 46).

"The unwieldy court of freemen was replaced by a tribunal of a limited and definite number. These 12 triers acted upon some cognizance of the facts involved in the dispute, but they derived that information from themselves; they were, indeed, a jury of witnesses testifying to each other.

"All the subsequent steps in the progress consisted in devices to aid this body of the freemen of the vicinage by the testimony of other persons not included in their number. When the divorce was effected between those acquainted with the matter in contest, and those appointed to decide upon it, the jury trial was essentially complete." Pomeroy's Municipal Law (2d Ed.), p. 74.

"As to the number of the jury. In early times the inquisition had no fixed number. In the Frankish empire we are told of a great variety of numbers. Among the Normans, also, it varied much, and '12 has not even the place of the prevailing *grundzahl.*' It may have been the recognitions under Henry II that established 12 as the usual number; and even there the number was not uniform. In the technical 'inquest of office,' it always continued to be uncer-tain: 'This is done,' says Blackstone, 'by a jury of no determinate number; being either 12, or less or more.' In 1199 there is a jury of nine. In Bracton's Note Book, at dates between 1217 and 1219, we see juries of 9, 36, and 40,—partly owing, indeed, to the consent of litigants. We have already noticed that the grand assize was 16, made by adding the four electors to the elected 12, and that recognitions as to whether one be of age were by eight. The attaint jury was usually 24; but in the reign of Henry VI a judge remarked that the number was discretionary with the court. * * *

"The requirement of 12 in the petit jury, *unless by consent,* and the need of unanimity, seemed now (A. D. 1318, 1319) to have become the settled rule. And, by-and-by, we shall read in Duncomb's Trials

*per pais* (A. D. 1665), this account of the sanctity
and foreordained character of the number 12: 'And
first as to their (the jury's) number 12: and this
number is no less esteemed by our law than by Holy
Writ. If the 12 apostles on their 12 thrones must
try us in our eternal state, good reason hath the law
to appoint the number 12 to try our temporal. The
tribes of Israel were 12, the patriarchs were 12, and
Solomon's officers were 12. 1 Kings, iv. 7. * * *
Therefore not only matters of fact were tried by 12,
but of ancient times 12 judges were to try matters
in law, in the Exchequer Chamber, and there were
12 counsellors of State for matters of State; and he
that wageth his law must have 11 others with him
who believe he says true. And the law is so precise
in this number of 12, that if the trial be by more or
less, it is a mistrial.' " Thayer, A Preliminary
Treatise on Evidence at the Common Law, pp. 85–90.

"There may well be justifiable curiosity as to the
reason for having 12 jurors instead of a greater or
fewer number. The explanation given in the Guide
to English Juries, and by Forsyth, is that 12 was
chosen in analogy to the 12 prophets and 12 dis-
ciples; also the 12 stones referred to in Bible his-
tory; and the institution of 12 judges, selected in
ancient days to try and determine matters of law,
are stated as a possible precedent. In addition,
there might be mentioned the code of the XII tables,
or compilation of the customary law of Rome, and
the fact that 12 was a favorite number for consti-
tuting a court among the Scandinavian nations.
Some writers think that, in the days when jurors
informed each other of facts within their knowledge,
by this custom, 12 witnesses, or jurors, became
adopted among the Anglo-Saxons and Normans as
the quantum of persons sufficient to establish the
credibility of a party to a transaction, or of one ac-
cused of an offense, and that, subsequently, when
independent witnesses, with a knowledge of the

facts, were produced to give evidence upon which the jury was required to pass, the original number of 12 jurors was naturally retained." Moschzisker's Trial by Jury (2d Ed.), § 401.

When jurors became known, the number of jurors varied and the number 12 emerged by reason of religious sentiment and analogy or for reasons now veiled in uncertainty. The history of common-law juries affords little help in the solution of the question here. The constitutional right of trial by jury is to remain. This has been greatly emphasized by the decisions of the court. Both the Constitution of 1850 and the Constitution of 1908 gave the legislature power to provide for trials by a less number of jurors than 12, the constitutional number provided in criminal cases in courts of record.

The question is whether defendant, on trial before a legally constituted jury of 12, when one juror became sick and defendant waived his presence and consented to go on with a jury of 11 to the completion of the trial, can, after conviction, disavow his election to so proceed and his waiver of a jury of 12 persons.

A waiver is an intentional relinquishment of a known right with knowledge of its existence and an intention to relinquish it. *International Fair & Exposition Ass'n* v. *Walker,* 88 Mich. 62; *Ridgeway* v. *City of Escanaba,* 154 Mich. 68; *Bessenger* v. *Wenzel,* 161 Mich. 61 (27 L. R. A. [N. S.] 516); *Marquette County Savings Bank* v. *Koivisto,* 162 Mich. 554; *Coffey* v. *McGahey,* 181 Mich. 225 (Ann. Cas. 1916 C, 923); *Schneider* v. *City of Ann. Arbor,* 195 Mich. 599.

The doctrine of waiver is quite as broad in criminal cases as in civil cases. *Emery* v. *State,* 101 Wis. 627 (78 N. W. 145); *Oborn* v. *State,* 143 Wis. 249 (126 N. W. 737, 31 L. R. A. [N. S.] 966).

"It has always been the law of this State that trial by jury in a criminal case may be waived by the accused when the statute so provides." *People* v. *Henderson,* 246 Mich. 481, which involved the construction of section 3 of chapter 3 of the code of criminal procedure (3 Comp. Laws 1929, § 17131).

Though there is no constitutional provision for defendant waiving trial by jury before a justice of the peace when charged with a misdemeanor, the statute does provide for such waiver; and it has been uniformly held a jury in such cases may be waived. *Ward* v. *People,* 30 Mich. 116; *People* v. *Steele,* 94 Mich. 437; *People* v. *Weeks,* 99 Mich. 86; *People* v. *Lane,* 124 Mich. 271; *People* v. *Jones,* 220 Mich. 633.

"If the legislature may under the Constitution provide for waiver of trial by jury in criminal cases before a justice of the peace, it may also provide for such waiver in trials in cases within the jurisdiction of other courts." *People* v. *Henderson, supra.*

"In *Hill* v. *People,* 16 Mich. 351, the people did not tender to defendant a lawful jury upon the trial, and that was the question for decision. And the same is true of *Swart* v. *Kimball,* 43 Mich. 443; and of *People* v. *Luby,* 56 Mich. 551. In *People* v. *Duffek,* 163 Mich. 196 (31 L. R. A. [N. S.] 1005), and *Underwood* v. *People,* 32 Mich. 1 (20 Am. Rep. 633), the question before us was not involved. Contention or remark that waiver of trial by jury in criminal cases is not permissible under the Constitution is wholly at variance with the consistent holdings of this court that trial by jury may be waived when authorized by statute." *People* v. *Henderson, supra.*

These cases involving waiver of jury trial in justice's court and in courts of record where authorized by statute do not decide the question here at issue.

*Hill* v. *People, supra,* is based upon the opinion in *Cancemi* v. *People, supra.* In that case, defendant was convicted of murder. The trial commenced with 12 jurors and, by consent of defendant and stipulation signed both by him and counsel and by the prosecuting officer, one juror was excused, and the verdict was by 11 jurors only. On a motion for a new trial, the question was raised whether or not a trial by a jury of 11 was trial by a constitutional jury. The court said (135):

"The researches of counsel have not enabled them to refer the court to any case directly in point, either in favor of or against this proposition, nor are the court aware of any such case; and hence it must be examined and decided in the light of principle, and such analogies as reported decisions afford."

After discussing the right of waiving a jury trial in civil cases, the court proceeded (136):

"Criminal prosecutions involve public wrongs, 'a breach and violation of public rights and duties,' which affect 'the whole community, considered as a community, in its social and aggregate capacity.' (3 Blackstone's Commentaries, 2, 4, 5.) The end they have in view is the prevention of similar offences, not atonement or expiation for crime committed. (3 Blackstone's Commentaries, 11.) The penalties or punishments, for the enforcement of which they are a means to the end, are not within the discretion or control of the parties accused; for *no one has a right, by his own voluntary act, to surrender his liberty or part with his life.* The State, the public, have an interest in the preservation of the liberties and the lives of the citizens, and will not allow them to be taken away 'without due process of law' (Const., art. 1, § 6), when forfeited, as they may be, as a punishment for crimes.   *   *   *

Objections to jurors may be waived; the court may be substituted for triers to dispose of challenges to jurors; secondary in place of primary evidence may be received; admissions of facts are allowed; and in similar particulars, as well as in relation to mere formal proceedings generally, *consent will render valid, what without it would be erroneous.* A plea of guilty to any indictment, whatever may be the grade of the crime, will be received and acted upon if it is made clearly to appear that the nature and effect of it are understood by the accused. In such a case the preliminary investigation of a grand jury, with the admission of the accusation in the indictment, is supposed to be a sufficient safeguard to the public interests. But when issue is joined upon an indictment, the trial must be by the tribunal and in the mode which the Constitution and laws provide, without any essential change. The public officer prosecuting for the people has no authority to consent to such a change, nor has the defendant.  *  *.  *

"It would be a highly dangerous innovation, in reference to criminal cases, upon the ancient and invaluable institution of trial by jury, and the Constitution and laws establishing and securing that mode of trial, for the court to allow of any number short of a full panel of 12 jurors, and we think it ought not to be tolerated."

Though it is declared that no one has a right, by his own voluntary act, to surrender his liberty or part with his life, yet, under the Constitution and laws of Michigan,—(1) any person charged with crime has a right, by his own voluntary act, to come into court and plead guilty, and thus surrender his liberty; (2) he has a right, at least by complying with the statute in relation to waiving trial by jury, to waive his constitutional privilege of a right of trial by jury in a criminal case in a court of record and consent that judgment may be rendered by the

court. *People* v. *Henderson, supra;* (3) a right to waive a trial by jury in courts not of record and to insist upon and enforce his right to be tried by the court without a jury; (4) in *People* v. *Redman,* 250 Mich. 334, the question of defendant waiving a jury of 12 in a trial *in a court of record* without complying with the statute was passed upon. A dissenting opinion said:

"Trial by a jury is a constitutional right. The statute provides how it may be waived, and it should be strictly construed and rigidly followed. Defendant did not waive a jury in writing, signed by him, as provided by statute. Not having waived trial by jury in the manner prescribed by the statute, he did not legally waive it at all."

But the court held, notwithstanding defendant was tried *in a court of record,* and "the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of *less than 12 men in all courts not of record,*" Const. 1908, art. 2, § 19, and the provisions of 3 Comp. Laws 1929, § 17131, and the decision in *People* v. *Henderson, supra,* the right to a trial by jury in that case was waived, and that "it was not error to proceed with the trial before the court without a jury, notwithstanding the waiver was not in writing."

If defendant in a criminal case in a court of record may orally waive a jury entirely and be tried by the court, I can see no reason why in a court of record he may not waive a trial by jury of 12 and consent to be tried by a jury of 11.

In *State* v. *Kaufman,* 51 Iowa, 578 (2 N. W. 275, 33 Am. Rep. 148), defendant was tried for forgery and upon the trial one of the jurors, being ill, was excused, with the consent of the defendant, who con-

sented to proceed with the trial before 11 jurors. Defendant was convicted. The question was raised as to whether such conviction could stand, having been made by a jury of 11. The court said:

"The Constitution provides that 'the right of trial by jury shall remain inviolate,  *  *  *  but no person shall be deprived of life, liberty or property without due process of law.' Article 1, § 9, Code, 770. That the jury contemplated by the foregoing provision should consist of 12 competent persons, will be conceded. The question for determination is whether a defendant in a criminal action, with the consent of the State and court, can waive the foregoing constitutional provision and is bound thereby. The first impression would be, we think, that a constitutional provision could be waived as well as a statute. Both, in this respect, have equal force, and were enacted for the benefit and protection of persons charged with crime. If one can be waived, why not the other? A conviction can only be legally obtained in a criminal action upon competent evidence; yet, if the defendant fails at the proper time to object to such as is incompetent, he cannot afterward do so. He has a constitutional right to a speedy trial, and yet he may waive this provision by obtaining a continuance. A plea of guilty ordinarily dispenses with a jury trial, and it is thereby waived. This, it seems to us, effectually destroys the force of the thought that 'the State, the public, have an interest in the preservation of the lives and the liberties of the citizens, and will not allow them to be taken away without due process of law.' *  *  *

"It matters not whether the defendant is, in fact, guilty; the plea of guilty is just as effectual as if such was the case. Reasons other than the fact that he is guilty may induce a defendant to so plead, and thereby the State may be deprived of the services of the citizen, and yet the State never actually inter-

feres in such case, and the right of the defendant to
so plead has never been doubted. He must be per-
mitted to judge for himself in this respect. So in
the case at bar. The defendant may have consented
to be tried by 11 jurors, because his witnesses were
then present, and he might not be able to get them
again, or that it was best he should be tried by the
jury as thus constituted. Why should he not be
permitted to do so? Why hamper him in this re-
spect? Why restrain his liberty or right to do as he
believed to be for his interest? Whatever rule is
adopted affects not only the defendant, but all others
similarly situated, no matter how much they may de-
sire to avail themselves of the right to do what the
defendant desires to repudiate.  *  *  *  Certain it
is that the right to dispense with one or more jurors
cannot be exercised without the consent of the court
and State, and it may safely, we think, be left to
them as to when or to what extent it may be exer-
cised. We, however, may remark, without com-
mitting ourselves thereto, that it is difficult to see
why a defendant may not, with the consent of the
court and State, elect to be tried by the court.
Should such become the established rule, many
changes of venue, based on the prejudice of the in-
habitants of the county against the defendant, might
be obviated.  *  *  *

"The foregoing views are sustained by *Common-
wealth* v. *Dailey,* 12 Cush. (Mass.), 80; *Murphy* v.
*Commonwealth,* 1 Met. (58 Ky.), 365; *Tyra* v. *Com-
monwealth,* 2 Met. (59 Ky.) 1. The crime charged
in these cases was a misdemeanor, but in the first
case this fact possessed no significance. The ruling
is based on principle applicable to all criminal ac-
tions. We are unable to see how it is possible to
draw a distinction in this respect between misde-
meanors and felonies, because the Constitution does
not recognize any such distinction.

"The contrary conclusion was reached in *Cancemi*
v. *People,* 18 N. Y. 128; *Allen* v. *State,* 54 Ind. 461;

and *Bell* v. *State,* 44 Ala. 393. In neither of these cases was the question largely considered. Substantially, they all seem based on the thought that 'it would be a highly dangerous innovation, in reference to criminal cases, upon the ancient and invaluable institution of trial by jury, and the Constitution and laws establishing and securing that mode of trial, for the court to allow of any number short of a full panel of 12 jurors, and, we think, ought not to be tolerated.' *Cancemi* v. *People,* before cited. This would have been much more convincing and satisfactory if we had been informed why it would be 'highly dangerous,' and should 'not be tolerated,' or, at least, something which had a tendency in that direction. For if it be true, as stated, it certainly would not be difficult to give a satisfactory reason in support of the strong language used."

In *State* v. *Sackett,* 39 Minn. 69 (38 N. W. 773), defendants were charged with assault and battery. They waived a jury of 12 and agreed to try the case before 11 qualified jurors, and upon this trial a conviction was had. They then made a motion for a new trial because such conviction was not valid. It was there said:

"The cases most largely relied upon in the books to sustain appellants' position are *Cancemi* v. *People,* 18 N. Y. 128, and *Hill* v. *People,* 16 Mich. 351. The argument presented, after calling attention to the vast distinction between civil actions and criminal prosecutions, is that the latter involve public wrongs, which affect 'the whole community, considered as a community, in its social and aggregate capacity;' the object being to prevent future offences. As they are not instituted to punish the guilty, and the penalties are not under the control of the accused, he has no right, 'by his own voluntary act, to surrender his liberty, or part with his

life.' The State, the public, having an interest in the citizen, will not allow his life or his liberty to be forfeited without due process, and in a strictly constitutional manner, and therefore radical changes in the prominent provisions as to the organization of legal tribunals, and the long-established modes of procedure, as prescribed by the Constitution, cannot be recognized or permitted. That as a jury of exactly 12 men is the only tribunal provided by the Constitution and the laws, no one has authority, nor can any person be allowed, to create any other.

"This then being, in substance, the line of thought pursued, and more or less elaborated upon, by those who have had occasion to write upon the subject, it only remains for us to compare such reasoning with that found in the cases wherein a conclusion directly opposite has been reached. These are notably *Commonwealth* v. *Dailey*, 12 Cush. (Mass.) 80, and *State* v. *Kaufman*, 51 Iowa, 578 (2 N. W. 275, 33 Am. Rep. 148) * * * in which it is said that, in criminal proceedings of all kinds, the defendants habitually waive some of their statutory and constitutional privileges; and it is pertinently asked upon what principle it can be tolerated as to one of these, and not as to all others, except it be a matter of jurisdiction. To be practical, suppose the accused foregoes a speedy or a public trial, or that he knowingly permits partial and prejudiced jurors to sit in judgment upon him, or that he expressly declines the process of the court by means of which his witnesses may be compelled to attend, or that he refuses to have counsel in his behalf, could it well be argued that he has relinquished rights which the Constitution cannot permit the citizen to forfeit, and that it is not competent for a defendant, by waiver or stipulation, to thus deprive himself of any of these numerous safeguards? But it has been said that waiving a speedy trial, declining counsel, permitting incompetent and inadmissible testimony, or voluntarily becoming a witness against one's self (all

guaranteed or inhibited by the Constitution), are
departures only from modes and methods of trial,
and do not bear upon the question of jurisdiction,
as does a departure from the number so well settled
as composing a common-law jury. This is true in
some degree; but suppose a defendant, well knowing
the facts, neglects to challenge a prejudiced juror,
or a nonresident, or an alien, could it be successfully
urged, upon motion in arrest of judgment, that his
constitutional rights had been disregarded to his
prejudice? No one would so contend, and yet the
accused is guaranteed 12 impartial jurors of the
county or district in which the crime is committed.
His right to unprejudiced men is as sacred and
probably more important than that there be pre-
cisely 12. By what process of reasoning can it be
demonstrated that the common-law jury, reduced,
through bias or incompetency, so that there are not
12 properly qualified, just, and unprejudiced minds
in the box, is the tribunal assured the accused, and
that a jury decreased in numbers is not? Com-
petency and impartiality are as essential as any
other quality upon criminal trials, unless we hold,
as was said by another, that there is some magic in
the number 12. The soundness of this position is
made clearer by a brief consideration of *Hill* v. *Peo-
ple, supra.* An alien became a juror, the defendant
having no knowledge of the fact. Conviction fol-
lowed, and upon appeal the court held that the de-
fendant was entitled to a new trial because he had
not been furnished the tribunal secured him by the
Constitution. That would be equally true if the
accused, advised of the incompetency of the juror,
had acquiesced in his selection. And yet would the
court have relieved the defendant from the effect
of his own misconduct, thus permitting him to trifle
with a constitutional right, shielding himself behind
a verdict in his favor should he be again in jeopardy,
and at the same time in position to assert error in
case of conviction? We think not.

"To meet another position which has been taken we can do no better than to again quote from *Commonwealth* v. *Dailey:* 'But it is asked, if consent will authorize a trial before 11 jurors, why not before 10, or 6, or 1? It appears to us that it is a good answer to say that no departure from established forms of trial in criminal cases can take place without permission of the judge, and no discreet judge would permit any such extravagant or wide departure from these salutary forms as the question supposes, nor any departure, unless upon some unforeseen or urgent exigency.' The wise and beneficent provisions found in the Constitution and statutes, designed for the welfare and protection of the accused, may be waived, in matters of form and substance, when jurisdiction has been acquired, and within such limits as the trial court, exercising a sound discretion in behalf of those before it, may permit. The defendants, having formally waived a juror, and stipulated to try their case with 11, cannot now claim that there was a fatal irregularity in their trial."

Under the Oklahoma Constitution, the accused in a criminal case has a constitutional right to have a list of the witnesses of the people at least two days before the case is called for trial. Notwithstanding this right, it has been uniformly held the defendant without any statutory authority may, by his own act, waive this constitutional right. *Blair* v. *State,* 4 Okla. Crim. 359 (111 Pac. 1003); *Starr* v. *State,* 5 Okla. Crim. 440 (115 Pac. 356); *State* v. *Frisbee,* 8 Okla. Crim. 406 (127 Pac. 1091).

The true rule is that the right of trial by jury is what Blackstone said of it: "*The most transcendent privilege* which any subject can enjoy," 3 Blackstone's Commentaries (Hammond's Ed.), p. 379, and, being a privilege, it may be waived by the voluntary act of defendant.

"To hold otherwise would seem to involve the conclusion that if a verdict of guilty does not convict, a verdict of not guilty does not acquit, and that in the latter case the defendant might be tried again perhaps after his witnesses had gone beyond his reach, and in a case perhaps where the very reason of his waiving a full panel of jurors was to prevent a postponement of his trial and the loss of important testimony." *State* v. *Borowsky,* 11 Nev. 119.

"If one may waive an entire jury trial in such a case, it certainly follows that he may consent to a trial by a jury of a less number than 12. We have no doubt that, had the jury·found the defendant not guilty, he would have been protected by such a verdict, even though it was rendered by a jury of 11. Having once been put in jeopardy, he could not be subjected to a second trial for the same offense. A defendant should not be permitted to speculate and take the chance of a verdict, favorable to himself, which would be a protection to him, and be relieved of liability in the event of an adverse verdict." *Miller* v. *State,* 116 Neb. 702 (218 N. W. 743).

"We can see no more reason why a person accused of a crime cannot waive his right to be tried by a jury of 12 and submit his case to a jury of a less number, than there is why he cannot waive a jury altogther and plead guilty. This is also true of a defendant's constitutional right to a speedy· trial, to be confronted face to face by the witnesses against him, to be tried in the county where the offense was committed, and other constitutional rights, all of which may be, and to a greater or less extent are, waived in almost every criminal case tried." *State* v. *Ross,* 47 S. D. 188 (197 N. W. 234).

See, also, *State* v. *Tiedeman,* 49 S. D. 356 (207 N. W. 153).

In early English common law, the king was the source of sovereignty, the fountain of justice, and the head of the church. One of the things which the barons forced King John, at Runnymede, to grant was that no one should be deprived of his liberty or his property without compliance with the law of the land. Bills of rights, though embodied in modern Constitutions, were in their origin agreements made between the king and the people. These bills of rights are not here limitations upon the absolute power of a king. Government here derives its powers from the consent of the governed. The legislative authority of the State can do anything which it is not prohibited from doing by the people through the Constitution of the State or of the United States. The Constitution of the State is not a grant of power. It is a limitation upon authority. At the common law, the individual was presented as a criminal by the people of his community; was placed on trial without specific charges made against him; deprived of counsel; was without authority to procure witnesses in his own favor; was not entitled to appear by attorney; might be tried and convicted upon affidavits made out of court; was denied the right of confrontation; and had no authority to cross-examine witnesses produced against him. The people have guaranteed to defendant in criminal cases the right of a speedy trial; this is a constitutional right, but there is no doubt defendant may waive it by asking for a continuance, and very frequently does not desire to have it, and delays trial as much as possible. Here he may have a public trial,—star chamber sessions have passed away; he is entitled to be tried, not by those who know about the facts, but by those who have formed no opinion as to the facts,—by an impartial jury; to be tried

by a jury of the vicinage; to be informed of the nature of the accusation against him; to be confronted by the witnesses against him; to have the assistance of counsel; to cross-examine the witnesses produced against him; to have compulsory process for the procuring of witnesses in his own defense; to have these witnesses paid by the public if he is not able to procure them at his own expense; and, in proper cases, he has the right of assistance of counsel on review of his case in the Supreme Court.

Where all these safeguards are thrown around a defendant charged with crime, where he may voluntarily confess his guilt and such confession may be proved against him on the trial; where he may waive a jury trial and enter a plea of guilty and such plea of guilty is made the basis of a judgment or sentence; where the legislature is specifically authorized to provide for a jury of less than 12 persons; where he may waive, in a court of record, upon complying with the statute, the right of trial by jury in a criminal case; and can waive the right of trial by jury, in a court of record, by his own voluntary act, regardless of the statute, there is no danger in permitting defendant in a criminal case to waive the privilege of trial by a jury of 12 persons and consent to be tried by a jury of 11 persons. He need not enjoy the right of a speedy and public trial by an impartial jury if he does not want to. He may consent to be tried by the court, or he may consent to be tried by a jury of less than 12. Under circumstances such as arose in this case, the defendant may be better satisfied to proceed with a jury consisting of 11 jurors already sworn than to take his chances upon the discharge of that jury and the impaneling of another.

In *Patton* v. *United States,* 281 U. S. 276 (50 Sup. Ct. 253, 70 A. L. R. 263), the question here involved was before the court, copiously briefed and exhaustively considered. It was held a jury of 12 could, under circumstances such as are here involved, be waived. In concluding the opinion, it is said:

"Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses. In such cases the value and appropriateness of jury trial have been established by long experience, and are not now to be denied. Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant."

All of the conditions suggested in *Patton* v. *United States, supra,* were fulfilled in this case. Relator waived his constitutional privilege to have a jury of 12 persons render a verdict. Defendant has shown right and title to the office in question. Relator is not entitled thereto.

Judgment will be entered accordingly. No costs.

NORTH, C. J., and FEAD, BUTZEL, BUSHNELL and EDWARD M. SHARPE, JJ., concurred with POTTER, J.

WIEST, J., concurred in the result. TOY, J., did not sit.